THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* MANUEL VÁZQUEZ ORTIZ, Defendant and Appellant.

No. 5551. Argued March 14, 1935.—Decided April 30, 1935.

414

*Angel M. Villamil* and *Gustavo Jiménez Sicardó* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Manuel Vázquez Ortiz was charged by the District Attorney of Humacao with the crime of murder in the first degree, committed on the person of José Nicolás Matta, in Naguabo, on November 12, 1932.

At the end of said month of November 1932, the defendant was arraigned. He pleaded not guilty and asked for a trial by jury. After the case was set for trial, two continuances were ordered at the request of the defendant. It was set for the third time, for trial on October 6, 1933. Two days before that date, the defendant moved for a change of venue to the district of Guayama. The court denied his motion on the following day, and on the next day it called the case for trial and the jury impaneled was accepted by both parties. After the evidence was introduced, the prosecuting attorney and the defense counsel made their closing arguments to the jury. The court instructed the jury and the latter brought in a verdict finding the defendant guilty of murder in the second degree.

On October 13, 1933, he moved for a new trial. The court denied the motion on November 21, following, and rendered judgment on December 4, sentencing the convict to 15 years' imprisonment in the penitentiary at hard labor.

Feeling aggrieved by that judgment, he appealed to this court. The transcript of record was filed on June 12, 1934.

After several extensions of time granted to the appellant at his request, he finally filed his brief on January 28, 1935. The hearing of the appeal took place on March 14, 1935, and thus the case was finally submitted for our consideration and decision.

It is maintained that the court erred in refusing the change of venue, in instructing the jury, and in not granting a new trial, and that the verdict of the jury was contrary to the evidence.

█ Let us examine the first assignment. The motion for a change of venue was based on the ground that a fair and impartial trial could not be had in the district of Humacao because the deceased, José Nicolás Matta, had been a person of influence in said district, a brother of Dr. Enrique Matta, a former senator from that district and a prominent member of the Socialist Party, which is an adversary of the Liberal Party to which the accused belonged; because he was also a brother or relation of other persons of high social standing, with excellent connections and great influence; because on the day of the occurrence, when the accused was being transferred from the police station at Naguabo to the municipal jail, an attempt was made to take him forcibly from the police, who had to make a great effort in order to save his life, one of the brothers having said that day to the widow of the deceased, "Don't worry, wherever we catch him, we'll kill him"; because when he was imprisoned in the district jail, Dr. Matta visited that establishment without the accused being aware of the reason for such visit, and one of the prisoners called his attention so that he might hide himself as his life was in danger; because on the day of his arraignment, he was accompanied to the court by seven policemen, as it was feared that his life was in danger, and because, on account of current rumors, the defendant's relatives refrained from furnishing bail for him, and decided to furnish it at the end of thirty days on condition that he leave the district.

The court considered that the application came too late, and it also stated that it was not convinced of the necessity for a change of venue, which it refused.

The application really was too late. It was presented more than ten months after the filing of the information and two days before the third setting of the case for trial, two continuances having been previously granted, as we have said, on motion of the defendant himself. The facts alleged to justify the conclusion that a fair and impartial trial could not be had in the district happened immediately after the occurrence and were known to the defendant from the beginning. Months passed and no threat was carried out. No concrete fact was alleged that showed the truth of the conclusion.

Under those circumstances, it can not be maintained that the error assigned exists.

██ In the second assignment, the instructions of the court of which the appellant complains are not specified. It is from the argument under this assignment that we learn that the part of the instructions complained of was the following:

"It is not necessary that the evidence produce absolute certainty in regard to the facts alleged, without any possibility whatever of error. If evidence producing such certainty were required, criminal actions could seldom be prosecuted successfully.

"*     *     *     *     *     *     *     *

"Other witnesses testified that that afternoon, coming along one of the roads of the plantation 'Montida,' Nicolás Matta, accompanied by Nicolás Elías, approached that plantation; they were at precisely the place towards which the accused was coming; Nicolás Elías called the attention of Nicolás Matta, Colín, the head overseer, saying 'There comes Don Manuel,' and Matta remained silent and kept on advancing; that when they came in sight of him, they were about 500 meters away, and when they come to pass, when they were about four or five feet from each other, the accused drew his revolver and began to shoot at Matta, etc."

In the first place, it does not appear that any exception was taken to the instructions. This alone would be sufficient for overruling the assignment, in accordance with the repeated decisions of this court on that point. See, among other cases, *People* v. *Mercado,* 46 P.R.R. 147; *People* v. *Maldonado,* 45 P.R.R. 405; and *People* v. *Serrano,* 35 P.R.R. 309.

It seems advisable, however, to add that the first paragraph above transcribed does not appear isolated in the instructions. It is connected with others which explain and complete the thought and which conform to the applicable law and jurisprudence.

As to the second objected paragraph, it will be sufficient to say that although there was only one witness who stated that he saw when the defendant drew his revolver and began to shoot at Matta, the truth is there were several persons who saw him shooting at Matta. The instruction might have been more accurate, but under the circumstances it can not be held that in the form it was given it found no support in the evidence, so as to constitute an essentially prejudicial error which might bring about the reversal of the judgment. Moreover, taking as a whole the summary of the evidence contained in the instructions, the conclusion must be reached that it is impartial and conforms substantially to the truth.

In considering the third and fourth assignments, we will reverse the order in which they are set forth and begin with the latter; that is, with the one wherein it is maintained that the verdict of the jury is contrary to the evidence.

The Government called nine witnesses to the stand. The accused, four, including his own testimony. Ramón Renta, Chief of the Insular Police of the District of Naguabo, was the first witness for the prosecution.

He stated that in November 1932, the accused presented himself at the police station and said that he had had a quarrel with Mr. Matta, at the plantation "San Cristóbal"; that he (Renta) tried to question him, but he made no state-

ment whatever; that at that moment there was a call from the hospital; that he went to the place of the occurrence and on the vicinal road itself found four discharged revolver cartridges; that there was another call from the hospital to inform him that Mr. Matta had died from a bullet wound; that he asked the accused where he had left the revolver and that the latter replied that he did not know where he had put it.

The defense did not cross-examine the witness, and the prosecuting attorney called Richard C. McCoy, field superintendent of the Fajardo Sugar Growers Association, to testify. He stated that the defendant was working with him as assistant overseer, and the deceased, Nicolás Matta, known as Colín, was the head overseer. That on the day of the occurrence, ''I was making my rounds of the plantation in an automobile with my assistant; I entered the plantation, I went to the stable, but I could not locate the head overseer or any employee, as we had not given timely notice. On leaving the San Cristóbal plantation by the lane that leads from the vicinal road to Naguabo, I saw the assistant overseer Vázquez on horseback, when he reached the automobile we greeted each other, as usual, and he made a sign to me to stop. We stopped the car; Vázquez dismounted and approached the automobile from the side opposite where I was sitting and asked me if I had seen Colín; I told him that I had not; then he told me that precisely he wished to talk to me about its having become impossible for him to continue working on San Cristóbal as assistant overseer because he and the head overseer did not get on well together, and he asked me to transfer him, otherwise he would resign. Then, after a moment, I told him that I could not at that time transfer any employee as it would be very costly for the company; then he said to me, 'I cannot continue to work here, so I will resign'; I answered him that his resignation was accepted and that he could advise me when he wished to leave, so that we could furnish him with transportation as

we customarily did in such cases. Then he thanked me for everything that I had done for him, but that he was leaving; then he mounted his horse and went away, and I continued with my work. That happened in the morning. Then I went back to the office in Fajardo as I had to go to San Juan in the afternoon with my family; I went to San Juan, and on returning at 6 or 6:30 and while passing by the municipal hospital at Fajardo, I saw a large crowd .... I stopped the car and asked what had happened, and they told me 'Colín is dead.' I was surprised, because no one expected it. He was a good, strong, healthy man.''

On cross-examination by the defense, he testified, in part, as follows:

''W. I did not have many complaints in regard to him; of course we all have our faults.—D. In spite of the faults we all have, what opinion did you have of the accused?—W. Very good, up to the last two months.—D. In what did the change in the last two months consist?—W. I received some complaints from the plantation.—D. Did you have complaints from Mr. Matta?—W. Yes, sir. That was on account of the election and of politics, and Colín Matta asked me if I could transfer him to another plantation because Vázquez was ill-treating the laborers and every once in a while he found him under the influence of liquor.—D. Colín told you that?—W. Yes, sir, as head overseer.—D. Did you personally ever find him in that condition?—W. No, sir.—D. Did you see him often?—W. Seldom.—D. Did any other person besides Mr. Matta complain to you of this gentleman?—W. My general field assistant.—D. Of what did he complaint?—W. The same thing, and that the head overseer of San Cristóbal was not pleased with the work of the assistant overseer.— . . . D. If he had not resigned would you have asked him to resign? —W. Yes, sir; that was the purpose of my trip in the morning, but I did not find him.—D. Although such was the purpose of your trip, you did not stop, but he stopped you?—W. Yes, sir, because he was coming and I went out in the car, and he motioned with his hand; I would have stopped in any case.''

Then José Feliciano, foreman in charge of cultivation, who was working under the orders of the deceased and of the accused, took the witness stand. On November 12, 1932,

about half past one in the afternoon, the accused met him and told him that Matta had had him fired and that that day he was going to have a quarrel with Matta either in the office or outside of it. The witness remained silent, but when Vázquez, the accused, went away, he sent word to Matta by a peon in order to prevent an encounter. At that moment Marcelino Meléndez appeared on horseback; he told him what had happened, and Meléndez went in search of Matta. He saw the accused again at about half past two or three in the afternoon, going in the direction of Montida. The witness is a cousin of the deceased.

Marcelino Meléndez was called upon to testify; he was overseer of the plantation "San Cristóbal" under the direction of Matta, whom he saw about four o'clock in the afternoon of the occurrence, in Montida, and gave him the news that Vázquez was going to have a quarrel with him. Matta answered "Don't worry; he is not crazy; he has to have a reason for having a quarrel." He went away and did not see Matta again. He attended his funeral the following day.

Ramón Pereira, cartman of the San Cristóbal plantation, testified that he saw the defendant between three and four o'clock on the road half-way between Montida and San Cristóbal. He heard a shot, looked back, and saw Don Colín wounded. He was lying on his back in the road. He spoke to the witness and told him that it was Don Manuel who had wounded him. Three of them lifted him and placed him further along in the shade of a tree. He went to get his cart and in it they carried the wounded man to the hospital.

Doctor Manuel Carreras, a physician and surgeon, was then called to the stand; he testified that he had performed the autopsy of the body of Matta, who was a white man, of medium height, of marked robustness, about thirty-eight years old, and who showed a bullet wound in the internal brachial region, corresponding to the upper third of the right arm; another bullet wound with an orifice of exit in the same left brachial region but in the upper third of the same right

arm, and another bullet wound in the lateral pectoral region of the thorax corresponding to the axillary line. When the thoracic cavity was opened, a great quantity of blood gushed out, about three and a half liters being collected. Death was due to the bullet wound that injured important organs.

José Juan Díaz, a laborer on the Montida plantation, passed the accused on November 12, 1932, on the Santiago road, and shortly afterwards he heard the shots: ''I looked back and it was Don Manuel who shot at Colín.'' He heard about four or five, one after the other.

Gil Pérez was going along with the above witness, José Juan Díaz, on the day of the occurrence, and at the crossing from Montida to San Cristóbal he met the accused who was on horseback. He saw Don Colín and Don Elías coming, and heard some shots. He looked back and saw Don Manuel shooting. He ran, calling his attention and saying, ''Don Manuel, stop; don't shoot any more, Don Manuel.''

The testimony of Díaz, as well as that of Pérez, is long and confused. It shows fear, especially in the part of the former, who said that he crawled under some wires, and the bewilderment naturally caused by suddenly witnessing an occurrence such as the one involved herein. It is the testimony of the following witness, Nicolás Elías, that gives us a clearer idea of what occurred.

He said that he was working as a time-keeper under the immediate orders of Matta, and that in the afternoon of November 12, 1932, was with him in Montida, which is a part of the San Cristóbal plantation a short distance from the main property, when ''we met Marcelo Meléndez who spoke to Don Colín and told him that he had had word that Don Manuel had said that wherever they met, they were going to have a quarrel, and that he should be on his guard. That is what Don Marcelo told Don Colín. Don Colín said to me, 'What do you think of that, Don Colo? He is not crazy; first we have to reason together; I haven't done anything to him.' We kept on, he riding on one colt and I on

another; we took the highway and we took the Montida and San Cristóbal road, and when we reached a crossing of the property known as 'San Francisco', straight ahead we saw Don Manuel coming about four or five hundred feet away, and I said to Don Colín, 'There comes Don Manuel' . . . . . When we came within about four or five feet, Don Manolo fired at him, and then, still facing him, (Matta) threw himself from his horse, took out his revolver and fired at him.''

The accused said nothing to the deceased before firing at him. Nor the deceased to the accused. ''All that was so quick. I am taking more time to tell it than it took to happen.'' The accused fired ''four or five shots; I am not sure.'' The deceased, ''I think, fired only two shots . . . with the right arm raised because the accused was on horseback and he on foot, on the ground.''

In answering the question, ''You do not know which shot wounded him?'' he replied, ''No, sir, I noticed when he was wounded, when he came out staggering and said to us, 'Oh, Don Colo, don't let him kill me!' and Juan Pérez was ahead and we went and picked him up.

While that was happening the defendant was ''quiet, about three or four steps from us, and immediately went back by the same road. When he passed by Don Colín he said, 'I won't kill you on the ground because I am a decent person.' ''

The witness was further examined and cross-examined at length. What we have just quoted remained, in our opinion, established as the true substance of his testimony.

After the prosecution had rested, the accused offered evidence, which consisted of the testimony of his wife, and that of Rosa Díaz, Nicolás Elías, José Torres, and of himself.

Mrs. Díaz referred to the friendly relations existing between the accused and the deceased, and between their respective families, up to two months before the occurrence, when there was discord because Matta believed that she and her husband had told his wife of his love affair with a cer-

tain country girl. Matta went to her house and said to her, "Doña Rosa, I beg of you not to walk with Ana (his wife) as I do not wish her to go out."

Nicolás Elías, whose testimony as a witness for the prosecution we already know, was called by the accused to testify, as he did testify, in regard to the fact that the horse that was being ridden by a very attractive girl from the ward of Duque, of Naguabo, had balked on passing near the houses of the accused and the deceased while their wives were in them. The horse belonged to the accused. The witness answered that he knew nothing as to whether, on account of the incident, the wife of the deceased and the girl had made any comments. He was called to take away the horse that was balking.

José Torres stated that he resided in Patillas; that he had known Vázquez for some four years, and Matta for about two weeks; that "on November 12, at about one o'clock in the afternoon, I was in a group near the paymaster's office, and he passed on horseback and asked if we had seen Manuel Vázquez; I told him that I had not seen him, and he asked, 'Don't you know if he is in town or on the plantation?' and we who were there, I particularly, answered, 'I don't know for sure where he is.' He went away, down from the office and said, 'That dog, that scoundrel, wherever we meet we are going to have a serious quarrel; either he kills me or I kill him' . . . When he went down, we remained talking and saying, 'What can be the trouble between the chief overseer and his assistant?' . . . and someone said, 'God knows whether it is on account of some woman'; and about fifteen or twenty minutes later Mr. Vázquez, the assistant overseer, appeared, and I said to him, 'Listen, Don Manuel, Don Colín passed by here looking for you, and wherever you may meet, you are going to have a serious quarrel; "this dog, this scoundrel, wherever we meet, either he kills me or I kill him."' And he went to the stable."

Finally, the defendant testified, in brief, as follows: That he knew Matta from the time that he went to work on the plantation. "Our friendship reached the point where . . . some Sundays his family would eat at our house, other times we would eat at his; we used to go to the country together."

That friendship cooled in the last two months. "He had in the country a girl who had fallen in love with him, and we went out together and he played the part of her lover, and it seems that his wife found it out and remonstrated with him and they quarreled; and he called my attention for the first time, and told me he supposed it was my wife and to try to prevent it; and we did not bother about that foolishness . . . One day he came to borrow a horse which belonged to me; he did not tell me what it was for; I lent it to him; it was to be sent to the country for that girl. She rode to town on the horse, and when she came up from the town . . . the horse, on passing near my house, stopped, and his wife who was there called her; she entered and they had a talk, but I don't know what passed between them.

"When we met, he called my attention again; and said that I should not have permitted the girl to go; that what I should do was positively to exclude his wife from my house; and I told him that, as she was a respectable person, I did not dare to throw her out of the house. He told me to try to prevent her from going to my house because that might bring about a serious quarrel between us . . . about two or three days before election, he brought the girl to the town to live with him, and the day before the occurrence, his wife knew it, and the day of the occurrence . . . On November 12, as I saw that coolness continued, I decided to see if I could talk to the chiefs of the Fajardo Central to find out if I could get a transfer, or to resign, because I saw that we were heading for a quarrel; and about ten o'clock in the morning I met the chief superintendent of the company, Mr. McCoy . . . he was in an automobile and I signaled him to stop and talked to him and told him that

for about two months the head overseer had been having quarrels with me; that I realized that it was on account of foolishness that was not worth the trouble, but that something might happen, and I asked him for a transfer, and he told me that a transfer would cost the company money and would be upsetting; and I spoke of resigning, and he told me to think it over and if things could not be arranged, to present my resignation when I wished . . . Afterwards I came about half past twelve, I came from having my hair cut . . . from the town . . . near the office I found a group of laborers; it was pay-day; and as I was passing they called my attention to something he had said about having a quarrel with me; I caught my horse and went to the stable, and told the stableman to saddle my horse; and I went home and told my wife to pack up the furniture and dishes as I was going to get a truck and move that afternoon or in the morning, and go away; and when I said that to my wife, I had the revolver I used and I put it in my pocket and went to the Esperanza plantation to look for feed for the animals, in order to avoid anything; and when I was going along that road where the event happened, there were three roads; I made inquiries in order to try not to meet him; it happened that I took the Montida road, and where I took the road there is a cane-field, and as the cane was tall I could not see him; and he came with the time-keeper from the opposite direction, and when I arrived at the curve, they were coming, and I could not prevent meeting them; on seeing him I touched the horse with the spur in order to pass and see if I could avoid a quarrel, but the horse was used to stopping whenever we met . . . on reaching his side, the horse stopped suddenly; he tried to draw his revolver and I drew mine, and he fired the first shot, and I threw myself from the horse, then the horse balked and I stood up and the horse got away from me; then he came forward and fired the second shot at me, but when the shot was fired, the horse became frightened and went away, and he fired at me and I fired

also. Afterwards he ran crying for help, and I stayed in the same place. What I wanted to do was to defend myself, and he ran crying for help. The only one I saw was Nicolás Elías, who was about 200 hundred feet away and came to pick him up, and while he was doing so, I caught my horse and came to town in order to avoid trouble, because I knew that he had relatives in Naguabo; and I went to the police station to give myself up.''

Later, the prosecuting attorney asked him the following question: ''Who fired the first shot?'' and he answered, ''The two of us; a shot from each of us at the same time.''

Such, in substance, was the evidence introduced. Its mere statement is sufficient for overruling the assignment. The conflict in the evidence having been resolved by the jury in favor of the prosecution, the verdict is fully justified. As to the adjustment of such conflict, there is nothing to show passion, prejudice, partiality, or manifest error; on the contrary, the jury showed sound judgment.

■ There only remains to be considered the assignment wherein error is attributed to the trial court for refusing to grant a new trial. There were alleged as grounds for the motion, the application for a change of venue, the fact that the court had ordered the peace officers to protect the defendant's life, to such an extent that the defendant was obliged to go and come between the court house and the hotel where he was boarding, in the custody of a detective, and while the trial was being held, another agent was seated to the left of the witness stand within the courtroom, two meters, more or less, from the place where the accused was; and other points that the accused stated that he could not mention specifically because he did not have in his possession the record of the case, where they were set forth.

The grounds on which the court based its refusal to grant a new trial were set forth in its decision of November 21, 1933, as follows:

"The court gave no order whatever to any officer for the purpose stated in the transcribed allegation, since that was outside the province of the court. For the same reason, the court did not intervene in any other measures adopted to guarantee the personal safety of the defendant outside the courtroom, and the court is unaware of their reality. Nor did the court order that, during the course of the trial, a peace officer should be stationed near the accused to protect him. Nor has it been shown that even if said measures were adopted, they came to the knowledge of the jury and influenced its verdict. Nor was there any manifestation or action whatever on the past of the accused during the trial, that indicated that he was at a disadvantage in defending himself, or that he was hindered from defending himself freely.

"The court admits that it was never convinced of the necessity for transferring the cause to another district, and it still holds the same view in that respect. In almost all criminal cases, the relatives of the injured person feel, as a manifestation of human nature, more or less intense aversion toward the accused, on account of the wrong done to their relative. However, it is incumbent on the authorities charged with the duty of maintaining the public peace, to prevent such hostile feeling toward accused from being translated into physical harm to his person. If the mere fear of such harm being caused were to determine the necessity for changing the venue in proceedings of this kind, it would become necessary in every case to hold the trial in a district other than that that where the offense was committed; which would not be compatible with the present established procedure in criminal cases nor with a better, more speedy, and expeditious administration of justice in such cases.

"Besides, it was not alleged nor shown specifically that in this case the alleged prominence of the deceased's family influenced the members of the jury to such an extent that they were prevented from trying the case in an impartial, fair, and equitable manner.

"Certain allegations contained in the motion for a change of venue induced the court to consider the use of its inherent powers for the purpose of maintaining order, without any disturbance whatever, in the court building and on the grounds thereof, and accordingly it took precautions to preserve said order as well as the personal safety of the defendant during all the time that he was in said building and on those grounds; but said precautions were always taken in the absence of the jury, and there is no evidence before the court to show that the jury had knowledge of them while it was trying the case, or that he had influenced the minds of the triers

of fact who participated in the proceedings. In regard to the precautions adopted by the authorities in charge of maintaining the public peace outside the court and its grounds, the court has no knowledge of any kind.

"During the hearing of this incident in regard to a new trial, evidence was introduced to the effect that several relatives of the deceased had called, during the day of the hearing, at the home of the marshal of this court. It has not been proved that any friendship which might exist between him and said relatives and their visit to his home were known to the members of the jury who tried the case, nor has it been shown that their minds were influenced in the performance of their function as judges; and the court can not arrive as such conclusion by conjecture."

Nothing needs to be added. No just ground for granting a new trial was established. The error assigned is non-existent. There is involved a judgment rendered in accordance with the facts and the law. The defendant has had all the ample guarantees that our institutions grant him, and justice now demands that he serve the sentence that was imposed upon him and which is within the limits of the penalty fixed by the Legislature for the crime with which he was charged and which it was proved that he committed.

The appeal must be dismissed and the judgment appealed from affirmed.